LIFESIZE, INC.,                            §
                                           §
            Plaintiff,                     §
                                           §
v.                                         §            1:16-CV-1109-RP
                                           §
BEAU CHIMENE,                              §
                                           §
            Defendant.                     §

## ORDER

Before the Court is Defendant Beau Chimene's Motion to Dismiss, (Dkt. 13). Having

reviewed the pleadings, the relevant case law, and the factual record, the Court issues the following

order.

## BACKGROUND

Plaintiff Lifesize, Inc. ("Plaintiff") is a Delaware corporation with its principal place of

business in Austin, Texas. Plaintiff is in the business of developing hardware, software, and

equipment for audio, web, and video conferencing and related services. Defendant Beau Chimene

("Defendant") is an individual residing in Austin, Texas. He was an employee of Plaintiff's

purported predecessor in interest, Lifesize Communications, Inc., formerly known as KMV

Technologies Inc. He is currently employed by Logitech.

Defendant began working for KMV Technologies ("KMV") as a senior engineer on

February 23, 2004. In this capacity, he managed a team that developed and maintained the

company's audio subsystems, hardware, and software and was privy to sensitive technological

information. As a condition of his employment, Defendant executed an Employee Proprietary

Information and Inventions Agreement ("Inventions Agreement"). The Inventions Agreement

provided, among other things, that Defendant would keep confidential KMV's proprietary and

confidential information during his employment and at all times thereafter, and that he would assign to KMV all intellectual property he developed during his employment. It also required him to return all company property upon the termination of his employment. The Inventions Agreement stated that these obligations would bind Defendant's successors and be for the benefit of KMV, its successors, and its assigns.

At some point thereafter, KMV changed its name to Lifesize Communications, Inc. ("LCI"). LCI was acquired by Logitech in 2009 and continued its business first as a subsidiary and later as a division of Logitech. Defendant asserts that he became an employee of Logitech in January 2010 and was required to sign an "Employee Agreement Regarding Proprietary Information and Inventions" (the "2009 Employee Agreement") that had provisions similar to those in Defendant's 2004 Inventions Agreement with KMV.

After the acquisition of LCI by Logitech, Defendant continued to serve as manager of the audio team for the LCI subsidiary. During this time, Defendant led the effort to make significant developments of LCI's speakerphone and related products. Two years of these efforts culminated in the release of LCI's second-generation speakerphone on February 28, 2012. According to Plaintiff, LCI's second-generation speakerphone represented a significant advancement in the quality and performance of speakerphones.

Plaintiff alleges that, unbeknownst to the LCI team, Logitech had another team concurrently developing a speakerphone and videoconferencing system that would compete directly with LCI's second-generation speakerphone and videoconferencing system. Logitech announced its system, the ConferenceCam CC3000e ("the CC3000e"), in January 2014. According to Plaintiff, the CC3000e was plagued with problems, received poor reviews, and was generally perceived to be an inferior product compared to LCI's system. Following the purportedly unsuccessful release of the CC3000e, Plaintiff alleges that Logitech employees responsible for the CC3000e's development began reaching

out to LCI's employees, including Defendant, to seek advice on how to improve the performance of their product. The LCI management was reluctant to share its intellectual property to assist in the development of a competing product. When Defendant sought approval to share information with Logitech employees, LCI management denied his request.

In or around October 2014, Defendant tendered his resignation from his employment at Logitech, indicating that he would leave his position at LCI to pursue other interests. Defendant retained a company-issued laptop and two engineering notebooks when he left.

In December 2015, Logitech spun off Lifesize, Inc., Plaintiff here, as a separate business entity. The record shows that Plaintiff is distinct from LCI, which remains fully owned by Logitech, though it appears Plaintiff carries on largely the same business which LCI had previously. As part of the spin-off, the parties executed an Intellectual Property Agreement (the "2015 IPA"), transferring certain technology and intellectual property ("IP") from Logitech and its affiliates (presumably including LCI) to Plaintiff and licensing a portion of the transferred IP back to Logitech. The IP encompassed within this agreement was all IP relating to Plaintiff's business, including videoconferencing devices such as its second-generation speakerphone.

Shortly after the spin-off, Plaintiff became aware that Defendant had accepted employment with Logitech. Plaintiff alleges that Defendant was or is working on Logitech's conference room products. Concerned that Defendant may be using its confidential information to develop competing products, Plaintiff requested written confirmation from Defendant that he would not disclose any confidential information to Logitech, that he had not retained any material containing its confidential information, and that he is not developing or assisting in the development of audio hardware, software, or subsystems for Logitech's competing products. Plaintiff received a response from Logitech's Deputy General Counsel on April 20, 2016. The response indicated that Defendant had not retained any of Plaintiff's materials and that Logitech had instructed Defendant not to

disclose any confidential information in his work at Logitech. It contained no response to Plaintiff's request that Defendant not work on competing videoconferencing products.

On May 4, 2016, Logitech's outside counsel contacted Plaintiff and revealed that Defendant had retained the laptop and two engineering notebooks that had been provided to Defendant while he was working at LCI. According to Plaintiff, Defendant used these items during the time he was engaged in developing LCI's second-generation speakerphone. Logitech returned the notebooks on or around May 23, 2016. Plaintiff alleges that the notebooks contained a trove of trade secrets from four years of Defendant's work at LCI. Logitech also returned the laptop, but not before Defendant provided it to Logitech's computer forensics expert, who deleted all files created or modified after November 17, 2014—a date roughly coinciding with the end of Defendant's work with LCI. The forensics expert also copied the deleted files, and has so far allegedly prevented Plaintiff from accessing them.

Plaintiff alleges that Logitech has refused its requests to reassign Defendant to work in an area that would not risk the disclosure of Plaintiff's trade secrets, and that Logitech refuses to provide assurances that Defendant is not working on developing competing products. Plaintiff asserts that Logitech has taken the position that it is entitled to use Plaintiff's IP in the creation of its competing products, pursuant to the terms of the IP Agreement executed as part of the spin-off of Plaintiff from Logitech.

Plaintiff has filed the instant lawsuit against Defendant, though not Logitech, alleging misappropriation of trade secrets, breach of contract, theft, conversion, trespass to personal property, and violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. Defendant moves to dismiss these claims under Rules 12(b)(1) and 12(b)(6), arguing that the Plaintiff lacks standing to assert them and, alternatively, that the allegations fail to state a claim on which relief may be granted.

# LEGAL STANDARD

## I.    Rule 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) calls into question the federal court's subject-matter jurisdiction. There are three avenues for a movant to demonstrate a lack of jurisdiction: (1) on the face of the complaint alone; (2) the complaint supplemented by undisputed facts in the record; and (3) the complaint supplemented by undisputed facts and the court's resolution of disputed facts. *Montez v. Dep't of Navy*, 392 F.3d 147, 149 (5th Cir. 2004). The burden of demonstrating that jurisdiction exists rests at all times with the party invoking the court's jurisdiction. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

Where a jurisdictional challenge is raised, the court is generally "free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case." *Montez*, 392 F.3d at 149. "However, where issues of fact are central both to subject matter jurisdiction and the claim on the merits, . . . the trial court must assume jurisdiction and proceed to the merits." *Id.* at 150 (finding that the issue of respondeat superior was central to plaintiffs' negligence claim and inappropriate for resolution under Rule 12(b)(1)).

## II.    Rule 12(b)(6)

When evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6) the complaint must be liberally construed in favor of the plaintiff and all facts pleaded therein must be taken as true. *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). Although Federal Rule of Civil Procedure 8 mandates only that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief," this standard demands more than unadorned accusations, "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather,

a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The court must initially identify pleadings that are no more than legal conclusions not entitled to the assumption of truth, then assume the veracity of well-pleaded factual allegations and determine whether those allegations plausibly give rise to an entitlement to relief. If not, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief. *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Throughout this process, the court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007).

## DISCUSSION

The Court first addresses Defendant's jurisdictional arguments and then turns to Defendant's motion to dismiss for failure to state a claim.

## I.      Defendant's Rule 12(b)(1) Motion

Defendant argues that the Court has no subject-matter jurisdiction over this case because Plaintiff lacks standing to pursue its claims. Standing, of course, is an indispensable component of subject-matter jurisdiction. *Roman Catholic Diocese of Dall. v. Sebelius*, 927 F. Supp. 2d 406, 415 (N.D. Tex. 2013) (citing *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 350 (5th Cir. 1989)). Thus, if Plaintiff indeed lacks standing, the Court must dismiss its claims.

Defendant's standing arguments go to each of Plaintiff's claims and primarily arise from the peculiar history and relationship between Logitech and Plaintiff. For example, with respect to

Plaintiff's theft, conversion, breach of contract, and Computer Fraud and Abuse Act claims—predicated largely on Defendant's retention of a laptop and two engineering notebooks—Defendant argues that Plaintiff lacks standing because Logitech, not Plaintiff, purchased and owns those items. Similarly, Defendant argues that Logitech, not Plaintiff, holds the rights arising under his 2004 Inventions Agreement with KMV, and that Plaintiff cannot assert a claim for breach of that contract because it was never assigned to Plaintiff. Finally, Defendant alleges that Plaintiff can assert no claim for misappropriation of trade secrets because Plaintiff "never employed [Defendant] and never owned the Laptop and notebooks," and thus presumably cannot establish that Defendant wrongfully acquired Plaintiff's trade secrets. (Def.'s Mot. Dismiss, Dkt. 13, at 9). The Court will evaluate each of Defendant's arguments in turn.

## A.    Counts 1 & 2: Misappropriation of Trade Secrets

Defendant's arguments concerning Plaintiff's lack of standing to assert misappropriation of trade secrets claims are a bit unclear. While he argues that a plaintiff can bring a misappropriation claim under state and federal law only if he or she has an enforceable property interest in a trade secret, he does not seem to contest that Plaintiff here has some enforceable property interest in the trade secrets at issue. Instead, Defendant appears to argue that he did not obtain the trade secrets stored within the laptop and notebooks by improper means because Logitech, not Plaintiff, owned those items, and because Logitech, not Plaintiff, was his employer and owner of the trade secrets when he accessed them.

To the extent Defendant does contest Plaintiff's ownership of the trade secrets, it is clear from the record that Logitech transferred to Plaintiff the trade secrets that form the basis of Plaintiff's claims. The 2015 IPA between Logitech and Plaintiff provided that "Logitech . . . hereby transfers, assigns and conveys to Company all of Logitech's right, title and interest in and to (i) the Transferred Patents, Transferred Trademarks and Transferred Other IP . . . and (ii) the Transferred

Technology. . . ." (2015 IPA, Dkt. 13-4, at 99). Transferred Other IP is defined as "items of Other IP owned by Logitech or any of its Affiliates . . . and that are embodied by any Technology listed on Schedule D." (*Id.*). Other IP is, in turn, defined as "Intellectual Property Rights other than Patents, Domain Names and Trademarks." Next, the 2015 IPA defines Intellectual Property Rights as "all rights arising out of the following . . . (i) patents . . . (ii) *trade-secret rights and all other rights in confidential business or technical information*, (iii) copyrights . . . (iv) domain names . . . and (v) any similar or equivalent rights to any of the foregoing . . . ." (*Id.* at 97–98 (emphasis added)). Schedule D to the 2015 IPA, which defines the class of Transferred Other IP, includes the second-generation speakerphone that is at issue here. (Schedule D, Dkt. 18-7, at 41). Thus, the 2015 IPA unambiguously (though perhaps convolutedly) transfers from Logitech to Plaintiff the trade secrets relevant to Plaintiff's second-generation speakerphone.

Defendant's remaining arguments concerning the entity that employed him and owned the laptop and notebooks address whether Defendant acquired the trade secrets through improper means. (*See* Def.'s Mot. Dismiss, Dkt. 13, at 7 ("[Plaintiff's] misappropriation of trade secrets claims are premised on the allegation that [Defendant] acquired through improper means [Plaintiff's] trade secrets, breaching contractual duties to return notebooks and the Laptop.")). As such, these are arguments of contested facts attacking an essential element of Plaintiff's claim and are inappropriately considered on a Rule 12(b)(1) motion. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) ("[I]f subject-matter jurisdiction turns on contested facts, the trial judge may be authorized to review the evidence and resolve the dispute on her own . . . . If satisfaction of an essential element of a claim for relief is at issue, however, the jury is the proper trier of contested facts."); Tex. Civ. Prac. & Rem. Code § 134A.002(3) (listing improper acquisition of a trade secrets a non-exclusive basis for liability for misappropriation).

The Court is thus concludes that it is appropriate to proceed with Plaintiff's trade secret claims.

### B.      Count 3: Breach of Contract

Defendant argues that Plaintiff lacks standing to pursue its claims on his 2004 Inventions Agreement with KMV because Plaintiff is not a party, assignee, successor in interest, or third-party beneficiary to the contract. Plaintiff responds that the issue of privity is a merits-based issue inappropriate for resolution on a Rule 12(b)(1) motion. Plaintiff further asserts that, in any case, it is in privity with KMV both because the 2004 Inventions Agreement was assigned to Plaintiff via the 2015 IPA and because Plaintiff is a successor in interest to KMV.

The Court agrees with Plaintiff that, at least under Texas law, the question of privity goes the merits of its claim. A Texas Court of Appeals recently stated:

> [A] challenge to a party's privity of contract is a challenge to capacity, not standing, and requires compliance with rule 93 of the Texas Rules of Civil Procedure. While the question of whether a party is entitled to sue on a contract is often informally referred to as a question of "standing," it is not truly a standing issue because it does not affect the jurisdiction of the court; it is, instead, a decision on the merits. When it is established that a breach of contract plaintiff lacks entitlement to sue on a contract, the proper disposition may be summary judgment on the merits, but it is not dismissal for want of jurisdiction.

*John C. Flood of DC, Inc. v. SuperMedia, L.L.C.*, 408 S.W.3d 645, 651 (Tex. App.—Dallas 2013, pet. denied) (internal quotations and citations omitted); *see also Yasuda Fire & Marine Ins. Co. v. Ciraco*, 225 S.W.3d 894, 898 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ("Although lawyers and courts occasionally state informally that an entity has no 'standing' to enforce a contract if that entity is not a party to the contract or a third-party beneficiary to it, such an entity's inability to sue goes to the merits and does not deprive courts of jurisdiction."). As the issue of Plaintiff's privity goes to the merits of its claims, it is inappropriate for resolution under Rule 12(b)(1).[1]

---

[1] The conclusion that privity is not jurisdictional is bolstered by the fact that a challenge to privity may be waived if not properly asserted. *See M & E Endeavors LLC v. Cintex Wireless LLC*, No. 01-15-

Even if the Court were to find that privity is jurisdictional in this case, it would conclude that Plaintiff has sufficiently established the likelihood that privity exists to survive the present motion to dismiss. Defendant has produced evidence in the form of a contract between Logitech and Plaintiff that demonstrates no manifestation of intent for Logitech to transfer the 2004 Inventions Agreement to Plaintiff. *See Harris Methodist Fort Worth v. Sales Support Servs. Inc. Emp. Health Care Plan*, 426 F.3d 330, 334 (5th Cir. 2005) ("An assignment is 'a manifestation to another person by the owner of a right indicating his intention to transfer . . . his right to such other person or third person.'"). However, the question whether Plaintiff is a successor in interest to KMV, thus assuming the benefit of the Inventions Agreement, presents a different inquiry. *See Sitaram v. Aetna U.S. Healthcare of N. Tex., Inc.*, 152 S.W.3d 817, 826 (Tex. App. 2004) ("With respect to corporations, 'successor' does not ordinarily mean an assignee."). The term "successor" denotes "a corporation which has become vested with the rights and has assumed the burdens of another corporation by amalgamation, consolidation, or duly authorized legal succession, and does not contemplate acquisition by ordinary purchase from another corporation." *Id.*

Defendant's evidence is lacking on this latter point, and in this regard his jurisdictional attack on the issue is more appropriately characterized as facial. *See Compass Bank v. Veytia*, No. EP-11-CV-228-PRM, 2011 WL 6046530, at *4 (W.D. Tex. Dec. 5, 2011). When a court evaluates a facial attack to jurisdiction, it must "look to the sufficiency of the allegations in the complaint because they are presumed to be true. If those jurisdictional allegations are sufficient the complaint stands." *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). Plaintiff has alleged that it received the benefit of the 2004 Inventions Agreement as the successor in interest to KMV and LCI. (Compl. ¶ 20). This suffices to demonstrate jurisdiction at this juncture. *See id.*

---

00234-CV, 2016 WL 1590642, at *4 (Tex. App. Apr. 19, 2016) (holding that defendant waived argument that plaintiff was not in privity with contracting party); *Arbaugh*, 546 U.S. 500, 514 ("First, 'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'") (quoting *United States v. Cotton*, 535 U.S. 625, 630 (2002)).

Moreover, the most probative evidence the Court has found on the issue suggests that Plaintiff indeed assumed the assets and liabilities of LCI and KMV from Logitech, thus becoming a successor in interest to those corporations. For example, the Sale and Purchase Agreement executed between Logitech and Plaintiff suggests that Plaintiff assumed the liabilities along with the assets set forth in that agreement. (Sale and Purchase Agreement, Dkt. 13-3, at 22). Additionally, Logitech's Form 10-K for the fiscal year ended March 31, 2016, indicates that Plaintiff held the assets to Logitech's videoconferencing business, which Logitech presumably acquired in the transfer of assets from LCI, prior to divestiture by Logitech. (Form 10-K, Dkt. 18-8, at 87). The 10-K also "classified the results of Lifesize video conferencing business as discontinued operations," which suggests that Logitech retained no part of the business, other than perhaps certain licenses. (*See id.*).

In sum, a jurisdictional ruling on whether Plaintiff is in privity is unnecessary at this point. To the extent a ruling is necessary, the allegations and evidence currently before the Court suffice at this time to demonstrate that Plaintiff is a successor in interest to KMV and LCI and thus has standing to sue on the 2004 Inventions Agreement.[2]

---

[2] Defendant argues for the first time in his Reply that the 2004 Inventions Agreement is irrelevant because it was replaced by a 2009 Employment Agreement between Defendant and Logitech. (Def.'s Reply, Dkt. 25, at 4–6). According to Defendant, the latter agreement, not the former one, gives rise to his duty to keep confidential the information forming the basis of Plaintiff's trade secret claims. (*Id.*). Plaintiff has indicated that it is only pursuing claims under the 2004 Inventions Agreement. (Pl.'s Sur-reply, Dkt. 36, at 2). That being the case, the Court views Defendant's arguments as raising questions about the scope of Defendant's obligations under the 2004 agreement and whether Defendant's actions can constitute a breach of the same. These issues concern the merits of Plaintiff's claims, not the antecedent question raised by Defendant's motion, which is whether Plaintiff has standing to assert claims under the 2004 Inventions Agreement. As such, the Court finds the issues more appropriately raised in a motion under Rule 12(b)(6) or Rule 56 and will not address them here. *See Williamson v. Tucker*, 645 F.2d 404, 416 (5th Cir. 1981) ("No purpose is served by indirectly arguing the merits in the context of federal jurisdiction. . . . This refusal to treat indirect attacks on the merits as Rule 12(b)(1) motions provides, moreover, a greater level of protection to the plaintiff who in truth is facing a challenging to the validity of his claim: the defendant is forced to proceed under Rule 12(b)(6) . . . or Rule 56 . . . .").

### C. Count 4: Conversion

Plaintiff's conversion claims are based on Defendant's retention of his laptop and engineering notebooks after he resigned from his position at LCI. Defendant argues that Plaintiff lacks standing to assert a claim for conversion because it never owned the laptop and notebooks, which he argues were purchased by Logitech. Further, Defendant further asserts that Plaintiff's claims are premised on the conversion of intangible property, which is not actionable under Texas law.

A plaintiff's ownership of or entitlement to the property that is the subject of its conversion claim is an express element of the cause of action. *Huffmeyer v. Mann*, 49 S.W.3d 554, 558 (Tex. App. 2001). As the issue is contested, it is to be decided on the merits rather than in a jurisdictional ruling. *Arbaugh*, 546 U.S. at 514. Defendant's argument that Texas law does not supply a conversion claim for theft of intangible property concerns only whether Plaintiff has stated a valid claim, not whether the Court has jurisdiction. *See Herrera v. NBS, Inc.*, 759 F. Supp. 2d 858, 863 (W.D. Tex. 2010) ("When a motion is incorrectly styled as a challenge to subject matter jurisdiction, but is in fact an attack on the merits of the claim, the proper course of action is to analyze the motion under Rule 12(b)(6) or Rule 56."). Accordingly, the Court will address this point in its review of Defendant's Rule 12(b)(6) motion below.

### D. Counts 5 & 6: Trespass to Personal Property & Theft

As with Plaintiff's conversion claim, Defendant argues that Plaintiff can assert claims for trespass to personal property and theft under the Texas Theft Liability Act only if it owns the property that is the subject of that claim. Defendant again argues that Plaintiff lacks standing because it did not own the laptop and engineering notebooks that form the basis of Plaintiff's claims. As discussed above, the question of ownership is intertwined with the merits of Plaintiff's claims and is thus inappropriate for resolution at this stage. The Court will not address this issue in

its analysis of Defendant's Rule 12(b)(6) motion because it concludes Plaintiff has adequately alleged ownership of the laptop and notebooks.

### E.    Count 7: Computer Fraud and Abuse Act

Finally, Defendant argues that Plaintiff lacks standing to assert its claim under the Computer Fraud and Abuse Act because it cannot show that Defendant lacked authorization to access his company laptop. The jurisdictional veneer given to this argument is thinner than the others: Defendant states directly that his challenge is to the "essential element of a CFAA claim . . . that the [defendant] access[] a computer 'without authorization or exceed[ing] authorized access.'" (Def.'s Mot. Dismiss, Dkt. 13, at 13 (quoting *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 583–84 (5th Cir. 2015)). As Defendant's argument admittedly goes to an essential element of Plaintiff's claim, the Court will not resolve it here, *Arbaugh*, 546 U.S. at 514. The Court additionally finds it unnecessary to address the issue in its Rule 12(b)(6) analysis because Plaintiff has sufficiently alleged ownership of the laptop and Defendant's lack of authorization to access it. (Compl., Dkt. 1, ¶¶ 68, 79, 96–102).

Having disposed of Defendant's jurisdictional challenge, the Court now turns to Defendant's motion under Rule 12(b)(6).

## II.    Defendant's Rule 12(b)(6) Motion

While the Court is empowered to consider and weigh evidence when evaluating a Rule 12(b)(1) motion, now that the sufficiency of the Plaintiff's pleadings is at issue under Rule 12(b)(6), the Court must confine its inquiry to the facts alleged in the Complaint, considering only such other documents as are incorporated in the Complaint by reference[3] or which are the proper subject of judicial notice. *Turner Indus. Grp., LLC v. Int'l Union of Operating Eng'rs, Local 450*, 8 F. Supp. 3d 875, 882 (S.D. Tex. 2014) (citing *Lone Star Fund V (U.S.), L.P. v. Barclay's Bank PLC*, 594 F.3d 383, 387

---

[3] In its Complaint, Plaintiff referenced the 2004 Inventions Agreement, (Compl. ¶ 20), and the spin-off agreements including the 2015 IPA. (*Id.* ¶ 40).

(5th Cir. 2010)). Keeping the limited scope of this inquiry in mind, the Court addresses each of the

Plaintiff's claims.

### A. Counts 1 & 2: Misappropriation of Trade Secrets

The Texas Uniform Trade Secrets Act ("TUTSA"), which displaced inconsistent common

law claims concerning conduct taking place after September 1, 2013, *see ZeniMax Media, Inc. v. Oculus*

*VR, LLC*, 166 F. Supp. 3d 697 (N.D. Tex. 2015), defines misappropriation as:

> (A) acquisition of a trade secret of another by a person who knows or has reason to
> know that the trade secret was acquired by improper means; or
> (B) disclosure or use of a trade secret of another without express or implied consent
> by a person who:
>> (i) used improper means to acquire knowledge of the trade secret;
>> (ii) at the time of disclosure or use, knew or had reason to know that the
>> person's knowledge of the trade secret was:
>>> (a) derived from or through a person who had utilized improper
>>> means to acquire it;
>>> (b) acquired under circumstances giving rise to a duty to maintain its
>>> secrecy or limit its use; or
>>> (c) derived from or through a person who owed a duty to the person
>>> seeking relief to maintain its secrecy or limit its use; or
>> (iii) before a material change of the person's position, knew or had reason to
>> know that it was a trade secret and that knowledge of it had been acquired by
>> accident or mistake.

Tex. Civ. Prac. & Rem. Code § 134A.002(3). "'Improper means' includes theft . . . [and] breach of a

duty to maintain secrecy . . . ." *Id.* § 134.002(2).[4]

Defendant argues that Plaintiff cannot assert a claim for misappropriation of trade secrets

because it cannot establish that Defendant acquired Plaintiff's trade secrets through improper means

or that it has suffered or is likely to suffer harm.

---

[4] The definitions of misappropriation and improper means under the federal Defend Trade Secrets
Act are identical to those under TUTSA in all respects material to the analysis here. *See* 18 U.S.C.
§ 1839. Accordingly, the Court's discussion of TUTSA is equally applicable to Plaintiff's DTSA
claims.

1. **Improper Acquisition**

Plaintiff alleges that Defendant acquired its trade secrets through improper means when he retained his company-issued laptop and engineering notebooks. This, according to Plaintiff, was both theft and in breach of Defendant's contractual duty to return the items to Lifesize. Defendant, on the other hand, argues that the 2004 Inventions Agreement was never assigned to Plaintiff, and "without a contract there cannot be acquisition through improper means." (Def.'s Mot. Dismiss, Dkt. 13, at 15). Defendant further asserts that the computer and notebooks were at all times the property of Logitech, and "there is nothing improper about [Defendant] accessing a Logitech computer as a Logitech employee." (*Id.*).

The Court agrees with Defendant that he did not acquire the trade secrets by improper means. Rather, his initial access to the trade secrets at issue, as well as his possession of the laptop and engineering notebooks containing them, were by permission of his employer. Plaintiff acknowledges this in its pleadings. (Compl., Dkt. 1, ¶ 20 ("[Defendant] was entrusted with . . . much of Lifesize's most sensitive technological information . . . ."); *id.* ¶ 2 (noting that the laptop and notebooks were issued to Defendant by the company)). While Defendant may have improperly *retained* those items, he did not improperly *acquire* them. *See Twister B.V. v. Newton Research Partners, LP*, 364 S.W.3d 428, 438 (Tex. App.—Dallas 2012, no pet.) ("[L]iability for a misappropriation of trade secrets claim occurs if he discloses or uses another's trade secrets, without privilege to do so, if (a) he *discovers* the secret by improper means . . . .") (emphasis added); 70 Tex. Jur. 3d Trademarks, Etc. § 65 ("[A] misappropriation of trade secrets claim requires proof that the defendant . . . *discovered* the secret by improper means . . . .") (emphasis added).

Acquisition by improper means is not the sole path to liability under TUTSA, however. A defendant can be liable for misappropriation of trade secrets if, at the time of the unauthorized use or disclosure of the information, the defendant knew he obtained the information in circumstances

15

giving rise to a duty to maintain its secrecy. *Id.* § 134A.002(3)(B)(ii)(b). In other words, it is not

necessary for the defendant's acquisition to be wrongful; the plaintiff may instead show that the

defendant permissibly acquired the information within a relationship of confidence and later

disclosed or used the information in violation of that confidence. *See id.* Plaintiff has adequately

alleged that Defendant acquired its trade secrets under a duty to maintain their secrecy. (Compl.,

Dkt. 1, at ¶ 50). The allegations that Defendant signed confidentiality agreements with both KMV

and Logitech suffice to show he knew or had reason to know of his duty of confidentiality. In these

circumstances, Defendant's argument that he was entitled to access his laptop as a Logitech

employee is irrelevant. Whether or not Logitech owns the laptop, Defendant may still be liable for

misappropriation of trade secrets if he uses or discloses without authorization the trade secrets on

that laptop with knowledge that he is under a duty to maintain their secrecy. Plaintiff plausibly

alleges that Defendant is engaged in this conduct and has therefore stated a viable misappropriation

claim.

### 2. Injury

Defendant argues that Plaintiff's misappropriation claim fails because Plaintiff cannot

establish that it has suffered any injury or threatened injury because, according to Defendant,

Plaintiff has licensed its trade secrets to Logitech and thus Defendant's disclosure or use of those

trade secrets in the course of his employment at Logitech cannot harm Plaintiff.

As an initial matter, Defendant appears to misconceive the requirements of TUTSA. In

order to obtain injunctive relief, TUTSA requires the plaintiff to establish "[a]ctual or threatened

*misappropriation*," not actual or threatened *injury*. Tex. Civ. Prac. & Rem. Code § 134A.003(a)

(emphasis added). Misappropriation, as TUTSA defines it, does not require a showing of injury

beyond the improper acquisition or the unauthorized disclosure or use of its trade secrets. *Id.*

§ 134A.002(3). Of course, the nature and scope of injury has bearing on Plaintiff's entitlement to

damages. *Id.* § 134A.004. As it concerns injunctive relief, however, the Court is of the view that the issue of any licensing of Plaintiff's IP to Logitech goes to whether Defendant is making use of Plaintiff's IP "without express or implied consent." *Id.* § 134A.002(3)(B).

On this latter point, the basis for Defendant's argument is the 2015 IPA, in which Plaintiff granted Logitech a license to certain intellectual property.[5] However, that contract does not support Defendant's claim that Logitech possesses a license to the trade secrets at issue here. Clause 4.2 of the 2015 IPA grants Logitech a license to Plaintiff's "Company Other IP," a defined term under the agreement. (2015 IPA, Dkt. 13-4, at 102). The IPA defines "Company Other IP" as:

> [A]ll items of [Intellectual Property Rights other than Patents, Domain Names and Trademarks] owned by [Plaintiff] immediately following the Effective Date that are, on the Effective Date, (i) embodied by, as works of authorship or otherwise, any Technology used in or held for use in the operation of the business of Logitech (which for clarity excludes the Business) and (ii) any information constituting Trade Secrets retained in the unaided minds of Logitech personnel.

(*Id.* at 97). The "Business" exclusion in the definition of Company Other IP is critical. It encompasses "the operations with respect to the designing, developing, having made, making, marketing, distributing, operating and selling any of the Company Products," (*id.*), including "high-definition, digital video conferencing hardware (as well as embedded software)." (*Id.*).

The trade secrets claimed in this case relate to Plaintiff's second-generation speakerphone, so they plainly fall within its "Business" and thus the exclusion from the IP license retained by Logitech. It also appears that Logitech's license to the trade secrets retained in the unaided mind of Logitech personnel is similarly inapplicable. Though Defendant argues he was a Logitech employee

---

[5] Defendant also submits a 2010 License Agreement between LCI and Logitech Europe, S.A., in which LCI grants Logitech Europe a non-exclusive worldwide license to use LCI's IP. The Court is not convinced that Plaintiff's cursory allegation that the trade secrets were not the subject of any technology licensed-back to Logitech suffices as a reference to this contract that renders it subject to consideration on a Rule 12(b)(6) motion. *See Brand Coupon Network*, 748 F.3d at 634. Even if it were, any license granted in 2010 to the trade secrets at issue would have been encompassed in Logitech's later transfer of "*all* of Logitech's right, title and interest in and to" the IP to Plaintiff in the 2015 IPA, unless explicitly reserved in that agreement. (2015 IPA ¶ 2.1 (emphasis added)). In the Court's view, therefore, the 2015 IPA is the sole relevant agreement.

at all relevant times, the relevant time for the purposes of the license is December 28, 2015, the effective date of the 2015 IPA. (2015 IPA, Dkt. 13-4, at 96 ("This [IPA] is made effective as of December 28, 2015)). No one contends that Defendant was a Logitech employee on that date. Accordingly, the license does not apply to any of Plaintiff's trade secrets Defendant may have retained in his unaided mind.

The Court cannot accept Defendant's apparent suggestion that this license encompasses all trade secrets in the minds of all employees who worked for Logitech at any time. It fights the most natural reading of the contract, under which the phrase "on the Effective Date" modifies both "retained in" and "Logitech personnel." Under this reading, the license includes only such information then known to those working for Logitech on December 28, 2015. Defendant's alternative reading would include the trade secrets held by any current or former employee of LCI or Plaintiff who worked for those companies during the time they were owned by Logitech. There is almost nothing that such a broad license would not include. Such an interpretation would render meaningless the limitations placed on the scope of the license in the 2015 IPA and the further clarification in its later amendment. *See HighMount Exploration & Prod. LLC v. Harrison Interests, Ltd.*, 503 S.W.3d 557, 562 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("To ascertain the parties' intentions, we examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless."). Further, to the extent the 2015 IPA is at all ambiguous on this point, the Court must construe the ambiguity in favor of the Plaintiff. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009) ("Usually, under Rule 12(b)(6), we must draw all reasonable inferences in the plaintiff's favor.").

As Plaintiff's allegations concerning non-consent and damages are not undermined by any license held by Logitech, the Court concludes that Plaintiff has adequately alleged these components

of its claims. Defendant has not challenged any other aspect of the claims, so the Court denies its motion to dismiss Plaintiff's trade secret misappropriation claims.

## B.    Counts 4 and 6: Conversion and Theft

Defendant argues that Plaintiff's claims for conversion and theft fail because they are based on the conversion of intangible property and because the claims are preempted by the Texas Uniform Trade Secrets Act. *See* Tex. Civ. Prac. & Rem. Code § 134A.007 ("[T]his chapter displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret.").

The Court first turns to whether Plaintiff has alleged the conversion of intangible property and then addresses the issue of preemption.

### 1.    Tangibility

"Texas conversion law . . . concerns only physical property." *Carson v. Dynegy, Inc.*, 344 F.3d 446, 456 (5th Cir. 2003). "Texas recognizes a limited exception to the tangibility requirement, allowing conversion of intangible rights embodied in or 'merged' with unique paper documents." *Beardmore v. Jacobsen*, 131 F. Supp. 3d 656, 667 (S.D. Tex. 2015) (citing *Prewitt v. Branham*, 643 S.W.2d 122, 123 (Tex. 1982)). Where intangible rights have merged with a tangible document, "[t]he conversion of the document in which the rights had been merged supports a conversion action for the value of the rights represented by it." *Prewitt*, 643 S.W.3d at 123.

Plaintiff's conversion claims are based on Defendant's alleged conversion of the laptop and engineering notebooks, as well as "certain data, including Lifesize's trade secrets and Proprietary Information, that was contained on the Lifesize Laptop." (Compl., Dkt. 1, ¶¶ 73–86). Insofar as Plaintiff's allegations are based on Defendant's retention of physical items—the laptop and notebooks—Plaintiff clearly has satisfied the tangibility requirement and thus has a conversion claim

for the value of these items (though not necessarily for the value of any trade secrets contained in them, as discussed below).

Plaintiff's allegations concerning the theft of data, however, are a different story. The weight of authority suggests that computer files and other digital data cannot independently support a conversion claim. *See, e.g., Beardmore*, 131 F. Supp. 3d 656, 667 (S.D. Tex. 2015) (finding that theft of an iPhone application did not support a conversion claim and listing supporting authority); *Quantlab Techs. Ltd. (BVI) v. Godlevsky*, 719 F. Supp. 2d 766, 779 (S.D. Tex. 2010) (finding that computer files were not tangible property and did not support claim for conversion). The Court has found one case within this circuit holding the contrary. *See In re Yazoo Pipeline Co., L.P.*, 459 B.R. 636, 654–55 (Bankr. S.D. Tex. 2011) (finding that the theft of seismic data supported conversion claim).

In *Yazoo*, the Bankruptcy Court found that seismic data stored on a computer could support a conversion claim. *Id.* Relying on a Fifth Circuit case that found seismic data stored on tapes and film to be tangible assets for federal taxation purposes, the court utilized a two-part test for determining whether an asset is tangible for a conversion claim under Texas law: (i) whether it could not exist apart from some physical storage medium, such as a computer, flash drive, tapes, or film; and (ii) whether it could be accessed by a human user in a manner analogous to the access of traditional tangible property." *Id.* at 653 (citing *Tex. Instruments Inc. v. United States*, 551 F.2d 599 (5th Cir. 1977)). To illustrate, the court posited a digital map: it could not exist without a storage medium and can be viewed on a computer screen in a way similar to a traditional map. *Id.* It distinguished the contrary holding of *Quantlab* by stating that the algorithms and mathematical models at issue were processes that could not be accessed by a human user in a manner analogous to the access of traditional tangible property. *Id.*

This Court finds *Yazoo* to be less convincing than the contrary holdings of other courts. First, it relied largely on a holding that paper tapes and film negatives were tangible items for the

purposes federal tax law rather than on cases analyzing whether electronic data is tangible for a state conversion claim. *See id.*[6] Of those cases discussing conversion claims, cases supporting its holding concerned the laws of other states, whereas the cited cases involving Texas law were contrary to the court's holding. *See id.* Second, the Court hesitates to endorse *Yazoo*'s test for tangibility and its application. It is difficult to imagine *any* digital data that can exist independently of a tangible storage medium, such as a computer or flash drive. Further, in distinguishing *Quantlab,* the court appears to overlook that the computer code constructing the predictive models in *Quantlab* could be rendered as text and "accessed by a human user in a manner analogous to the access of traditional tangible property." *See id.* Indeed, *Yazoo*'s digital map is also comprised of set of coded instructions that, when executed, operate to produce a visual rendering of a geographical area on a user's computer screen. The court provided no justification for expanding conversion claims to instructions and algorithms that operate to produce something for which there is a familiar tangible analog while denying protection to instructions and algorithms that do not.

This Court is sympathetic to the concerns of the New York Court of Appeals, reproduced in *Yazoo*, that "electronic records that [are] stored on a computer [are] indistinguishable from printed documents" and that "[i]t would be a curious jurisprudence that turned on the existence of a paper document rather than an electronic one." *See Thyroff v. Nationwide Mut. Ins. Co.*, 8 N.Y.3d 283, 292–93 (N.Y. 2007). However, in situations like the current one—where the state courts have not spoken on an issue—this Court is also mindful of its duty as a federal court sitting in diversity jurisdiction "not [to] expand state law beyond its presently existing boundaries." *Barfield v. Madison County, Miss.*, 212 F.3d 269, 272 (5th Cir. 2000) (quoting *Rubinstein v. Collins*, 20 F.3d 160, 172 (5th Cir. 1995) (en banc) ("We have long followed the principle that we will not create 'innovative theories of recovery or

---

[6] It seems uncontroversial that the paper tapes and film negatives in *Texas Instruments* would be tangible items for the purposes of state conversion law, too.

defense' under local law, but will rather merely apply it 'as it currently exists.'")). *Yazoo* does not convince the Court to expand the scope of Texas law to cover the conversion of digital data files.

Accordingly, the Court grants Defendant's motion to dismiss Plaintiff's conversion claims to the extent they are premised on the conversion of its data.

### 2. Preemption

As noted above, TUTSA provides that it preempts all "conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." Tex. Civ. Prac. & Rem. Code § 134A.007(a). Excluded from the scope of preemption are "contractual remedies," "other civil remedies that are not based upon misappropriation of a trade secret," and "criminal remedies." *Id.* § 134A.007(b).

Defendant asserts that Plaintiff's conversion and theft claims fall within TUTSA's preemption provision to the extent they are based on Defendant's conversion or theft of trade secrets. Plaintiff responds that Defendant mischaracterizes its claims, which are not for the conversion or theft of the trade secrets themselves, but for the theft and conversion of the property carrying the trade secrets.

Liability for misappropriation of trade secrets does not distinguish between the forms a trade secret may take. Proprietary information may constitute a protectable trade secret whether it is written on paper, stored in a computer file, or contained in the memory of a former employee. *See In re Cooper Tire & Rubber Co.*, 313 S.W.3d 910, 918 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (trade secrets contained in documents); *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 464–65 (Tex. App.—Austin 2004, pet. denied) (trade secrets contained in ZIP files); *Bayco Prods., Inc. v. Lynch*, 3:10-CV-1820-D, 2011 WL 1602571, at *4 (N.D. Tex. 2011) (former employee's "know-how" was plausibly a trade secret). Where a plaintiff shows a defendant has stolen an item containing or representing the plaintiff's trade secret, the plaintiff has established no more than the

elements of misappropriation under TUTSA. *See* Tex. Civ. Prac. & Rem. Code § 134A.002(2)–(3) ("Misappropriation means: acquisition of a trade secret of another by a person who knows . . . [it] was acquired by [theft] . . . ."); *360 Mortg. Grp., LLC v. Homebridge Fin. Servs, Inc.*, A:14-CA-00847-SS, 2016 WL 900577, at *6 (W.D. Tex. Mar. 2, 2016) ("A claim is not preempted if the plaintiff is able to show the claim is based on facts unrelated to the misappropriation of the trade secret.").

This does not mean that all claims for conversion or theft of items containing trade secrets are preempted by TUTSA. The intent of the law's preemption provision is only to "prevent inconsistent theories of relief for the same underlying harm . . . ." *360 Mortg. Grp.*, 2016 WL 900577, at *6 (quoting *Smithfield Ham and Prods. Co., Inc. v. Portion Pac, Inc.*, 905 F. Supp. 346, 348 (E.D. Va. 1995)). Where the plaintiff's conversion or theft claim is addressed to the harm stemming from the loss of the tangible item itself, rather than the trade secret it contains, it seeks relief from harm other than for the misappropriation of its trade secret. Its remedy is then the value of the item or the return of the property and damages for loss of use. *R.J. Suarez Ents. Inc. v. PNYX L.P.*, 380 S.W.3d 238, 242 (Tex. App. 2012). Where the plaintiff directs its conversion claim at the loss of the intangible right contained or integrated with the tangible item, its claim clearly addresses and seeks recovery for the same harm contemplated by TUTSA. *See* Tex. Civ. Prac. & Rem. Code § 134A.002(3). It thus falls within the language of TUTSA's preemption statute. *See id.* § 134A.007.

To the extent Plaintiff's conversion and theft claims seek recovery for the value of the property bearing its trade secrets, namely, the notebooks and laptop, they constitute "other civil remedies that are not based upon misappropriation of a trade secret." *See id.* § 134A.007(b)(2). The Court therefore denies Defendant's motion to dismiss these claims on grounds of preemption. If successful, Plaintiff may seek to recover the value of those items. *See R.J. Suarez Ents.*, 380 S.W.3d at 242. However, the Court dismisses Plaintiff's claims to the extent Plaintiff seeks to recover the value

of the trade secret under a theory that its intangible rights have merged with computer or notebooks. As explained above, the Court finds this remedy to be preempted by TUTSA.

## CONCLUSION

For the reasons stated above, the court **DENIES** Defendant's Motion to Dismiss under Rule 12(b)(1), and **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion to Dismiss under Rule 12(b)(6). Plaintiff's conversion claims are **DISMISSED** to the extent they rely on the conversion of electronic data. Plaintiff's conversion and theft claims are **DISMISSED** to the extent they seek recovery of the value of Plaintiff's trade secrets. Defendant's motion is otherwise **DENIED**. (Dkt. 13).

 **SIGNED** on April 26, 2017.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE